UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Cr. No. 23-cr-373 (DLF) |
| | ) | |
| JOSHUA HURTADO | ) | |
| | ) | |
| Defendant. | ) | |

## SENTENCING MEMORANDUM

Joshua Hurtado, through undersigned counsel, respectfully submits this memorandum requesting that the Court consider his entire life and the various legal arguments made in this sentencing memorandum in determining a fair and just sentence.

### Background

Mr. Hurtado has pleaded guilty to the offense of Possession of a Firearm, under 18 U.S.C. 922 (g). Mr. Hurtado fully accepts responsibility for leaving a firearm in a car on November 6, 2022.

At the time of the incident, Mr. Hurtado was just 22 years old. He was brought to this jurisdiction, by writ, on November 23, 2023 – about one year after the incident. Because of the detainer created by indictment from this offense, Mr. Hurtado did not benefit from halfway house placement at the end of his last sentence – a one year period of incarceration from his supervised release case.

It is clear from his history that Mr. Hurtado's issues with the criminal justice system stem from his addiction to substance abuse that began when he was a teenager. While there was some early alcohol and marijuana use that foreshadowed potential problems, his family can identify the moment that drugs became a problem – at 17 years old. That was when a man who owed

him money from a dog-sitting job broke his jaw, hospitalizing Mr. Hurtado for a week.  That incident led to the use, prescription and addiction to codeine.   The following year he was shot in the foot – this time he was prescribed Percocet.   By then, Mr. Hurtado had a full blown addiction to opiates.  These extended periods of hospitalization and recovery also hampered his progress in school and he began to fall short in his grades, leading to him dropping out.  Moreover, he experienced a trifecta of tragic loss in his older teenaged years.  In 2019, he had two uncles who were murdered.  In 2020, a close friend was shot and killed.  His depression became more severe and his depression and his addiction grew stronger.  His substance abuse has been an underlying issue for all of the poor choices Mr. Hurtado has made ever since.  Crippled by depression and sick of the abuse he suffered from his brother, Mr. Hurtado decide to leave the house and began a life of couchsurfing and, in essence, homelessness.  The instability, depression and substance abuse made these months the most difficult period in his short life and he fell into a pattern of poor choices.  He realizes now that his actions have only amplified the his brother's problems and his parents' heartache.

      Mr. Hurtado needs help.  He fully acknowledges that he had opportunities to get at least some treatment when he was supervised in Virginia.  He recalls participating in an assessment and that there being funding issues at one point.  But he recognizes that he lacked the maturity and motivation to take on the enormous challenge of confronting his addiction.  He is more motivated than he has ever been and has grown significantly in the two-plus years since he had half-heartedly entered treatment.  In hindsight, he recognizes that he felt emotionally overwhelmed because he had to attend mental health and substance abuse and gambling treatment.  When he would experience setbacks, he feared reprisal.  Eventually, he lost motivation and started using drugs and gambling again.  But much has changed.

Mr. Hurtado now recognizes that he ***needs*** treatment in order to become the adult that he knows he can be and, because of the Court's Order, he has made gains in correcting his course. He and counsel have discussed the sacrifice that his parents made by coming to the United States. While he grew up poor, Mr. Hurtado recalls his parents' continuous hard work to climb incrementally up the socio-economic ladder. And as both he and his brother face legal issues, he has seen the pain suffered by his mother especially, by the poor choices he has made.

Mr. Hurtado knows that he did not take advantage of previous opportunities from his conviction when he was 20 years old and he fully intends to show the Court that he is determined to get on track. He admits that he was not ready for supervision three years ago. He had been incarcerated pretrial in the federal Virginia case and was given a sentenced that amounted to time-served. His reentry and rehabilitation was less than ideal and combined with his young age, he did not have the ability or insight to overcome his addiction and the criminality that he had undertaken.

While incarcerated, he has applied for and received Virginia Medicaid so that he does not have to rely upon funding in order to get treatment. He has received drug treatment, though his facility, Northern Neck Regional Jail, only provides suboxone treatment. But he used his time effectively at Northern Neck, completing GED classes and passing the exam. He received drug treatment at CTF after the Court ordered him to Department of Corrections custody. In sum, he has received over twenty certificates in his the five months that he has been at CTF.[1]

Mr. Hurtado's path to rehabilitation has already begun. Beyond seeking treatment, he has also received his GED while incarcerated (in July 2024). PSR ¶ 82. He is a bright young man

---

[1] Counsel is still in the process of collecting the certificates and will submit them when they are received.

with significant potential. He pursued his GED – one of the few opportunities at NNRJ – because he recognizes that he needs to find stability and build earning capacity. He is anxious to use his newfound diploma to learn a specialized trade so that he can begin his transition to productive adulthood.

## ARGUMENT

### Sentencing Law

Twenty years ago, the Supreme Court held that "the Federal Sentencing Reform Act of 1984…ma[de] the Guidelines effectively *advisory*." *United States v. Booker*, 543 U.S. 220, 245 (2005). Under *Booker*, the "district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing. " *Id.* at 264 (citing *See* 18 U.S.C. §§ 3553(a)(4), (5)). While holding that district courts should still consider the Guideline calculations and ranges for sentencing purposes, the Supreme Court in *Booker* held that courts must consider all the purposes of sentencing set forth in 18 U.S.C. § 3553(a). Overall, in light of *Booker*, courts must treat the Guidelines as one among several of the sentencing factors.

Pursuant to 18 U.S.C. § 3553(a) – as explicitly endorsed by the Supreme Court in *Booker* – sentencing courts should consider the need for the sentence imposed:

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; and
>
> (D) to provide the defendant with the needed educational and vocational training, medical care, or other correctional treatment in the most effective manner

Several years after *Booker*, the Supreme Court made clear that the "Court's overarching

4

duty" is to "'impose a sentence sufficient, but not greater than necessary,'" *Pepper v. United States*, 562 U.S. 476, 493 (2011) (quoting 18 U.S.C. § 3553(a)), to comply with "the four identified purposes of sentencing: just punishment, deterrence, protection of the public, and rehabilitation," *Dean v. United States*, 137 S. Ct. 1170, 1175 (2017); *see also* 18 U.S.C. § 3553(a)(2).

In determining such a sentence, the sentencing court must consider the United States Sentencing Guidelines, the nature and circumstances of the offense, the history and characteristics of the defendant, the need for the sentence imposed to serve the purposes of sentencing, the kinds of sentences available, the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct, and the need to provide restitution to any victims of the offense. *Id*. § 3553(a)(1). In addition, the sentencing court may consider any "information concerning the background, character, and conduct" of the defendant, including age, educational and vocational skills, mental and emotional conditions, and lack of guidance as a youth. *Id.* § 3661.

Congress has further provided that:

> [t]he court, in determining whether to impose a sentence of imprisonment, and, if a term of imprisonment is to be imposed, in determining the length of the term, shall consider the factors set forth in Section 3553(a) to the extent that they are applicable, *recognizing that imprisonment is not an appropriate means of promoting correction and rehabilitation*.

18 U.S.C. § 3582(a) (emphasis added). With that limitation and considering all of the purposes of sentencing, the Court must impose a sentence that is "sufficient, *but not greater than necessary*, to comply with the purposes [of sentencing]." *Id*. § 3553(a) (emphasis added).

Since *Booker*, the Supreme Court reaffirmed that the Sentencing Guidelines are merely one factor to be considered by district courts when fashioning a reasonable sentence and that the Sentencing Guidelines are not to be weighed more heavily than other sentencing factors. *See Rita*

*v. United States*, 551 U.S. 338 (2007); *Gall v. United States*, 552 U.S. 38 (2007). A sentencing court shall not simply presume that a sentence within the Guideline range is automatically reasonable or that a sentence within the Guideline range is more reasonable than a sentence outside of the Guideline range. *Rita*, 551 U.S. at 338; *Gall*, 552 U.S. at 46. The sentencing court further shall not presume that a sentence outside of the Guidelines range is unreasonable. *Id.* By considering the Sentencing Guidelines along with all of the factors set forth 18 U.S.C. § 3553(a), "the sentencing court subjects the defendant's sentence to the thorough adversarial testing contemplated by federal sentencing procedure." *Rita*, 551 U.S. at 351. It is critical for sentencing courts to consider all sentencing factors and to not give undue weight to the Sentencing Guidelines because, as the Supreme Court has long emphasized that "'[i]t has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue.'" *Gall*, 552 U.S. at 52 (quoting *Koon v. United States*, 518 U.S. 81, 113 (1996)); s*ee also United States v. Faison*, No. GJH-19-27, 2020 U.S. Dist. LEXIS 27643, at *4-5 (D. Md. Feb. 18, 2020)("But if judges are not careful, a rote application of the Guidelines can turn what is often a life-defining moment for the defendant into a check-the-box, formulaic calculation devoid of the individualized sentencing we strive for.").

**I.    The guidelines calculation**

As reported by the PSR and noted in the Plea Agreement, the proper guideline range for Mr. Hurtado is 27-33 months. He is in Criminal History Category II and his offense level after acceptance of responsibility is 17.

**II.    The guidelines do not incorporate recent understanding about the culpability of children in criminal offenses.**

It is noteworthy that Mr. Hurtado was 22 years old at the time of this offense and 20 years old at the time of his previous offense. The Sentencing Guidelines do not reflect an appreciation for what has now been widely recognized as the brain development of young adults and the impact of that development on judgment. §4A1.1, which does little to distinguish young adults from older offenders, generally reflects outdated and disproven assumptions about brain function and development.

Within the context of teenagers, the Supreme Court has recognized developments in psychology and brain science showing that juveniles (1) "have a lack of maturity and underdeveloped sense of responsibility, leading to recklessness, impulsivity, and heedless risk-taking"; (2) "are more vulnerable to negative influences and outside pressures, including from their family and peers," "have limited control over their own environment and lack the ability to extricate themselves from horrific, crime-producing settings"; and (3) possess character traits that are "less fixed" than those of an adult. *Miller v. Alabama*, 567 U.S. 460, 471 (2012) (quotation marks and citations omitted). As a result, the Court has concluded that juveniles "have diminished culpability and greater prospects for reform." *Id*.; *see also Roper v. Simmons*, 543 U.S. 551, 569-70 (2005).

Other studies warn against drawing an arbitrary age cutoff that assumes a person sense of responsibility switches on at a particular birth date. Research shows that "psychosocial capabilities that improve decision making and regulate risk taking—such as impulse control, emotion regulation, delay of gratification, and resistance to peer influence—continue to mature well into young adulthood." James C. Howell et al., *Bulletin 5: Young Offenders & an Effective Response in the Juvenile & Adult Systems: What Happens, What Should Happen, & What We Need to Know*, Doc. No. 242935, at 17, Papers From the Study Group on Transitions From

7

Juvenile Delinquency to Adult Crime, Nat'l Inst. Of Just., U.S. Dep't Of Just. (July 2013) (unpublished) (citation omitted).  Thus, "[y]oung adults simply do not have the physiological capacity of adults over age 25 to exercise judgment or control impulses," *id*. at 18, and it is "difficult to justify applying permanent or long-term sanctions to young offenders," including young adults in their early twenties, Carrie Mulford, *Explanations for Offending*, Nat'l Inst. Of Just., U.S. Dep't Of Just., 2 (May 2014).

The Sentencing Guidelines fail to consider or account for this research.  By contrast, "[r]elying on both the scientific evidence and the societal evidence of national consensus," lower courts have "conclude[d] that the hallmark characteristics of juveniles that make them less culpable also apply to 18-year-olds." *Cruz v. United States*, 2018 WL 1541898, at *25 (D. Conn. Mar. 29, 2018); *see also id.* at *23-25 (discussing uncontested, credible expert testimony that the scientific findings that underpin conclusions about those under the age of 18 also apply to 18-year-olds).  Accordingly, it is contrary to both conventional wisdom and brain science to impose increased sanctions on Mr. Hurtado now based on his difficulties complying with rules when he was a twenty year old.

### III.     The Appropriate Sentence is 22 months plus one year of supervised release.

A modest variance is appropriate in this case.  When sentencing a defendant, the Court must treat the Guidelines "as one factor among several" that § 3553(a) requires the Court to consider.  *Kimbrough v. United States*, 552 U.S. 85, 90 (2007).  Once the Court correctly calculates the sentence that the Guidelines recommend, the Court must then "make an individualized assessment," considering the remaining factors set forth in § 3553(a).  *Gall v. United States*, 552 U.S. 38, 50 (2007).  Because the Guidelines merely reflect a "wholesale" view "rough[ly] approximat[ing] . . . sentences that might achieve § 3553(a)'s objectives,"

8

*Booker* and § 3553(a) require the Court to tailor an individualized sentence that actually does achieve § 3553(a)'s objectives in the case before it. *Rita v. United States*, 551 U.S. 338, 348, 350 (2007). This Court should not presume that a Guidelines sentence is reasonable and should, instead, consider whether or not the applicable Guidelines sentence properly reflects § 3553(a) considerations and whether "the case warrants a different sentence regardless." *Id.* at 351. Indeed, "it remains the judge's duty to tailor every sentencing to the case and defendant at hand," regardless of the guidelines range. *United States v. Sabillon-Umana*, 772 F.3d 1328, 1330 (10th Cir. 2014) (Gorsuch, J.). Recently, a U.S. District Court Judge explained the following:

> During the sentencing hearing, the lawyers and the judge discuss the appropriate sentence, often at great length, but after the judge announces a decision, that judge, the lawyers, and the staff move on to the next case; the hearing and outcome soon fade into distant memory. Meanwhile, for the defendant, the torture of a monotonous existence begins, while life for his family moves forward without him. For him, every day, month and year that was added to the ultimate sentence will matter. The difference between ten and fifteen years may determine whether a parent sees his child graduate from high school; the difference between ten and fifteen months may determine whether a son sees his sick parent before that parent passes away; the difference between probation and fifteen days may determine whether the defendant is able to maintain his employment and support his family. *Thus, it is crucial that judges give careful consideration to every minute that is added to a defendant's sentence. Liberty is the norm; every moment of incarceration should be justified.*

*United States v. Faison*, No. GJH-19-27, 2020 U.S. Dist. LEXIS 27643, at *3-4 (D. Md. Feb. 18, 2020) (emphasis added).

### A. The History and Characteristics of Mr. Hurtado

Mr. Hurtado is a 24 year old man and has lived in Virginia area for nearly all of his young life. He is the son of two naturalized American citizens who came to the United States in pursuit of the American dream. He is the youngest of three children by a substantial margin – his brother Giezi is 37 and his sister Miriam is 34. His sister and parents provide Mr. Hurtado support.

9

Mr. Hurtado's parents relocated to Virginia when he was three but the family struggled. Chief among their problems was Giezi's adjustment to the United States. He repeatedly got into trouble and Mr. Hurtado recalls the police often coming to their house. His mother was young when she had Giezi and was perhaps poorly equipped to handle him. He was later deported because of his criminal convictions and lives in Mexico. In fact, Mr. Hurtado's parents will not be able to attend his Sentencing Hearing because they will be in Mexico to support Giezi, who appears to be in trouble there. Giezi, who was abusive both to Mr. Hurtado and his parents, drove a wedge into the family as his parents used much of their time and resources to try and help him.

While there were periods of financial stability, Mr. Hurtado's childhood was marred by periods of poverty or near poverty. But while he describes not having food at times, Mr. Hurtado knows that he was fortunate to have parents who strived for a better life and respects all of their efforts. They raised Mr. Hurtado to work and when he was a teenaged student, he dried cars at a car wash, worked for his uncle Alberto and worked as a dog sitter.

The dog sitter job indirectly led him to the substance abuse that underlie so many of Mr. Hurtado's issues. His mother recalls the injury came from a conflict with a customer who would not pay. That customer broke the teenaged Mr. Hurtado's jaw, resulting in an extended hospital stay and introduced Mr. Hurtado to opiates. A year later, Mr. Hurtado was in the hospital again, this time because he was shot in the foot. He became addicted to opioids in that stay and has struggled with drugs ever since. Within a year, Mr. Hurtado had moved out and was on his own.

Mr. Hurtado returned home when he was released from prison but was not ready to confront his addiction and mental health issues. He recognizes now that he has thus far wasted the path that his parents have cleared for him and his siblings and is anxious to show his parents

that he can do better and to reject the call of fast and easy cash.

To Mr. Hurtado's credit, he has advanced his cause substantially while incarcerated. At Northern Neck, he received his GED, something that he had been struggling to accomplish in the last four years. Since he was transferred to CTF, he enrolled in the RSAT and pledged to complete every program he could. To date, he has obtained upwards of twenty certificates for various vocational classes.

### B. The Nature and Circumstances of the Offense

Possession of a firearm is not a violent offense, as a matter of fact or law, as "[n]either the act of possessing a weapon nor the fact of being a felon is in itself a crime of violence." *United States v. Gloster*, 969 F. Supp. 92, 98 (D.D.C. 1997); *see also Rehaif v. United States*, 139 S. Ct. 2191, 2197 (2019)("possession of a gun can be entirely innocent."); *Johnson v. United States*, 135 S. Ct. 2551, 2563 (2015) (J. Thomas, concurring)("Under conventional principles of interpretation and our precedents, the offense of unlawfully possessing a short-barreled shotgun does not constitute a "violent felony" under the residual clause of the Armed Career Criminal Act (ACCA)."); *Staples v. United States*, 511 U.S. 600, 611 (1994). Therefore, imprisonment for the purpose of incapacitation is similarly not necessary or warranted.

Nor is possession of a firearm a crime of violence.[2] In 2018, 21% of this District's court docket were felon in possession cases,[3] compared to 10% nationwide.[4] Mr. Hurtado's firearm

---

[2] "The federal court for the District handled 392 criminal cases of all kinds in 2018, including 83 felon-in-possession gun cases and 16 gun-related interstate robbery cases, according to court records and prosecutors." Washington Post Article, also available at https://www.washingtonpost.com/local/legal-issues/us-to-prosecute-districts-armed-ex-convicts-in-federal-court-in-surge-against-gun-violence/2019/02/05/1f518926-2363-11e9-90cd-dedb0c92dc17_story.html (last viewed on March 9, 2020).
[3] See footnote 1, supra.
[4] Nationwide, gun possession offenses represented approximately 10% of the crimes reported to the U.S. Sentencing Commission in FY 2018. See U.S. Sentencing Commission Quick Facts

was found inside the back seat map pocket of a car.  There is no evidence that he ever pulled out the gun, fired the gun or brandished the gun.  His conduct did not involve violence or involvement in a drug ring.  He is not a member of a gang or a leader of a drug organization.  When Mr. Hurtado went out to establishments on the evening of the incident, he did not carry a firearm with him.

### C. The Need for the Sentence Imposed

18 U.S.C. § 3553(a) directs the Court to consider four objectives of federal sentencing to impose a sentence that is "sufficient, but not greater than necessary" to achieve those goals.  In this case, the Court must determine what punishment is necessary, beyond the 12 month sentence that he served prior to the issuance of a writ in this case, within the context of §3553.  The first purpose is to "reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." 18 U.S.C. § 3553(a)(2)(A).  Mr. Hurtado accepted responsibility for his actions and is sincere in his desire to start a new life.

Another purpose of sentencing is to "afford adequate deterrence." *Id.* at § 3553(a)(2)(B).  While "[p]rison is an important option for incapacitating and punishing those who commit crimes," evidence shows that lengthy prison sentences do not have a "chastening" effect and "produce at best a very modest deterrent effect." *Five Things About Deterrence*, Nat'l Inst. Justice, U.S. Dep't of Justice (May 2016) at 1-2.  Research shows conclusively that "[t]he *certainty* of being caught is a vastly more powerful deterrent than the punishment," that "[s]ending an individual convicted of a crime to prison isn't a very effective way to deter crime," and that "[i]ncreasing the severity of punishment does little to deter crime." *Id.* (emphasis in

---

Felon in Possession FY 2018, available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/Felon_In_Possession_FY18.pdf (last viewed March 9, 2020).

12

original).  Significantly, "the crime prevention benefit falls far short of the social and economic costs," *id.* at 2, especially in light of the fact that U.S. Sentencing Commission "research has demonstrated that reductions to sentence length and time served do not harm public safety," *Transforming Prisons, Restoring Lives*, Charles Colson Task Force on Federal Corrections, Urban Inst. (Jan. 2016) at 21.  *See also* Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime*, 8 Cardoza J. Conflict Resolution 421, 447-48 (2007) ("Certainty of punishment is empirically known to be a far better deterrent than its severity.  Moreover, to Mr. Hurtado, the specific deterrence from his actions cannot be compartmentalized between incarceration in West Virginia to incarceration at Northern Neck.  The only important timeframe to him is his incarceration since December 20, 2022.

**D.   A Sentence Below the Guideline is Not an Unwarranted Sentencing Disparity**

A below guideline sentence would not create an unwarranted sentencing disparity.  In fact, a guideline sentence would surpass the 24 month average incarceration sentence for 922(g) offenses with the same offense level and criminal history score.   This Court must consider the "need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6).

Whether any difference among sentences is warranted or unwarranted depends on the individual circumstances of each case and their relationship to the purposes of sentencing. "Unwarranted disparity is defined as different treatment of *individual* offenders who are similar in relevant ways, or similar treatment of *individual* offenders who differ in characteristics that are relevant to the purposes of sentencing." U.S. Sent'g Comm'n, *Fifteen Years of Guidelines Sentencing: An Assessment of How Well the Federal Criminal Justice System Is Achieving the Goals of Sentencing Reform* 113 (2004).

13

Over the last five years, courts have been increasingly imposing non-government sponsored below guideline sentences in firearm cases. *See* Quick Facts, Felon in Possession of a Firearm https://www.ussc.gov/research/quick-facts/section-922g-firearms. In 2023, courts imposed sentences that vary from the guidelines in over 40 percent of these cases, 89% of which varied downward. *Id.* Of those offenders who received a below guideline sentence, the average reduction was approximately 36%. *Id.*

Recently, judges in this Court have varied substantially from the Guidelines, particularly in 922 (g) cases. In *United States v. Richardson*, 23-cr-200-1 (JDB), the court varied and sentenced the defendant to 40 months in a 922(g) case where the guideline range was 51 to 63 months. In *United States v. Watkins*, 23-cr-62 (TSC), the court sentenced the defendant to 22 months in a 922(g) case where the guideline range was 30 to 37 months. This case was also for a possessory gun offense imposed while the defendant was on supervised release for a possessory gun offense. In *United States v. Norris*, 22-cr-35 (TFH), the defendant was on supervision for a manslaughter and was arrested with a firearm. The district judge imposed a sentence of 18 months, notwithstanding a guideline range of 30 to 37 months. In *United States v. Van Dyke, Jr.*, 19-cr-344 (JEB), the Court varied downward and sentenced the defendant to time-served in a 922(g) case where the guideline range was 37 to 46 months. In that case, the defendant had a prior conviction for carjacking and had made extraordinary efforts at rehabilitation while on pretrial release. This Court imposed a below-guidelines sentence where the defendant was arrested for gun possession and multiple guns and ammunition were recovered from the defendant's home and where the defendant had a prior conviction for first-degree murder for which he had served 15 years. *United States v. Williams*, 20-cr-37 (DLF) (30 months imposed though applicable guideline range was 41 to 51 months). Recently, a district judge imposed a 40

14

month sentence to a defendant under supervision for voluntary manslaughter. *United States v. Gattison*, 24-cr-476 (JMC) (40 months imposed though guideline range was 57-71 months). The Court's primary justification was the defendant's youth, twenty-three at the time of the incident. A 22 month sentence for Mr. Hurtado would not create an unwarranted sentencing disparity.

    **IV.**    **U.S.S.G. § 2K2.1 Does Not Embody § 3553(a) Considerations or Result in Sentences That Might Achieve § 3553(a)'s Objectives.**

When the Guidelines were first promulgated in 1987, to create a guideline for unlawful firearm possession, the Sentencing Commission attempted to "synthesiz[e] a coherent rationale that generally explain[ed] and [was] reasonably consistent with current sentencing practice." USSC, *Supplementary Report on The Initial Sentencing Guidelines and Policy Statements*, 18 (1987). The Commission acknowledged that there were not enough statistically-significant patterns for sentencing prohibited firearm possession to create a clear guideline, noting that its "detailed statistical analyses . . . were of little value in explaining or rationalizing current sentences." *Id*. Although the Commission found that pre-Guidelines sentences had statistically-irrelevant ranges likely because of "the wide variety of circumstances under which these offenses occur," the Commission found that the "*actual or intended use* of the firearm was probably the most important factor in determining the sentence." U.S.S.G. § 2K2.1, cmt. background (1987). The Commission created guideline § 2K2.1 with a base level of 9 points, reduced to 5 if the firearm was possessed for lawful sporting use, or enhanced if the firearm was used in another offense. *See* U.S.S.G. § 2K2.1(a) (1987). Today, because of amendments made in 1991, a defendant's actual or intended use of the firearm plays no role in determining the Guideline range. Instead, prior criminal history and type of weapon are largely determinative. Moreover, under today's guidelines, a base offense level of 14, which is in Zone D, rarely allows a defendant to be sentenced to serve a non-prison term.

15

In 1989, the Commission increased the base offense level by 3 points, from 9 to 12, U.S.S.G. § 2K2.1(a) (1989), to reflect an increase in the statutory maximum penalty for unlawful firearm possession, which Congress doubled from 5 to 10 years in the Anti-Drug Abuse Act of 1988, *see* U.S.S.G. app. C, amend. 189, 100-101 (1989).

Then, in 1991, against the weight of empirical evidence collected from 1987 to 1990, the Commission completely erased and replaced the firearms guidelines. Similar to the now-discredited drug guidelines, the Commission dramatically increased the penalties proscribed under § 2K2.1 "in light of the Congressional sanction of a minimum 15 years for a prohibited person with three prior felonies of violence or controlled substance offenses." 1990 Commission Report 19. To create a framework "proportional" to the ACCA, the Commission doubled the base offense level for a defendant with two prior crimes of violence or controlled substance offenses, from 12 to 24, effectively increasing the penalties prescribed for such defendants six-fold. *See id.* 19-23.

Since the Commission looked to the mandatory minimum ACCA sentence to create the firearm guidelines, and ignored "empirical data and national experience," the § 2K2.1 provisions "do not exemplify the Commission's exercise of its characteristic institutional role" or "reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives." *Kimbrough*, 552 U.S. at 109 (internal quotation marks and citations omitted); *see also Gall*, 552 U.S. at 46 & n. 2. Instead, as demonstrated in this case, the Guidelines drastically overstate the seriousness of the offense by ignoring relevant considerations, such as the nature and circumstances of Mr. Hurtado's circumstances and the need for society to have individuals like Mr. Hurtado successfully reenter society.

Like in *Gall*, "[a]ny term of imprisonment in this case would be counter effective by

16

depriving society of the contributions of the Defendant who . . . understands the consequences of his criminal conduct and is doing everything in his power to forge a new life." 552 U.S. at 44 (citation omitted) (quoting district court).  Mr. Hurtado requests a sentence of twenty-two months, in order to begin the next stage of his life and to secure his productive place in the community. The requested sentence is not greater than necessary, and is sufficient for the purposes of sentencing.

## Conclusion

A sentence of twenty-two months followed by a one year term of supervised release is a serious consequence that will more than adequately punish Mr. Hurtado for his particular conduct and will also adequately deter any future wrongful conduct.  Thus, for the reasons stated above, including Mr. Hurtado's history and characteristics, together with the other goals of sentencing, Mr. Hurtado respectfully requests that the Court impose such a sentence.

Respectfully submitted,

A.J. KRAMER
FEDERAL PUBLIC DEFENDER

_____/s/_____
EUGENE OHM
Assistant Federal Public Defender
625 Indiana Avenue, N.W., Suite 550
Washington, D.C.  20004
(202) 208-7500